ORIGINAL

Receipt Number
541313

56

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

JOHN H. FRINGER,

Derivatively on behalf of PROQUEST COMPANY,

Plaintiff,

vs.

ALAN ALDWORTH, JAMES P. ROEMER, GARY L. ROUBOS, DAVID G. BROWN, MICHAEL GELTZEILER, WILLIAM E. OBERNDORF, LINDA G. ROBERTS, FREDERICK J. SCHWAB, TODD S. NELSON, RANDY BEST, AND KEVIN G. GREGORY.

Defendants,

-and-

Nominal Defendant,

PROQUEST COMPANY.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case: 2:06-cv-11845
Assigned To: Edmunds, Nancy G
Referral Judge: Whalen, R. Steven
Filed: 04-18-2006 At 04:28 PM
CMP FRINGER V PROQUEST CO (EW)

**VERIFIED SHAREHOLDERS' DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, UNJUST ENRICHMENT AND CONSTRUCTIVE FRAUD SEEKING EQUITABLE RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

## INTRODUCTION

Plaintiff herein advises this Court that lawsuits concerning similar subject matters have been filed in this Court including the actions styled as *Betty O' Connell, et al v. Proquest Company, Alan W. Aldworth and Kevin G. Gregory*, bearing case no. 06-10738, before the Honorable Avern Cohn and *Industry City Associates Employee Pension Plan Trust Money Purchase U/A 3/10/1986, et al. v. ProQuest Company, Alan W. Aldworth and Kevin G. Gregory*, bearing case no. 06-CV-10619 also before the Honorable Avern Cohn.

This is a shareholders' derivative action brought on behalf of ProQuest Company ("ProQuest" or the "Company") against certain of the Company's officers and directors. The claims asserted herein arise from defendants' grossly negligent and reckless acts, including misrepresenting the condition of ProQuest's business to Company shareholders, manipulating and falsifying reported financial results, and allowing ProQuest's top executives and managers to take millions of dollars *via* bonuses paid based on phony profits. Defendants' misconduct caused ProQuest to violate U.S. securities laws, including the Sarbanes-Oxley Act. Defendants' illegal and improper actions have also resulted in the filing of several class action law suits against ProQuest for violations of the federal securities laws. These actions seek hundreds of millions of dollars in damages and investor losses, as well as the initiation of a formal investigation by the Securities and Exchange Commission ("SEC") into the Company.

## OVERVIEW

1.      On February 9, 2006, prior to the opening of trading, defendants caused the Company to publish a release which stated that ProQuest would be forced to restate its previously reported financial results for the period 1999 to 2005, as a result of *discovering "material irregularities" in the Company's accounting*. This release also stated that *the Company's previously issued financial statements for fiscal years 1999 through 2004, quarterly periods in 2005, and the company's guidance for fiscal 2005, could no longer be relied upon.*

2.      In addition to the foregoing, as a result of this restatement, defendants also revealed that the Company was no longer in compliance with certain covenants and representations and warranties of its revolving credit agreement and its private-placement debt, including certain financial covenants and representations made with regard to previously issued

2

financial statements.   While defendants stated that it would then be necessary to secure waivers from its revolving credit agreement lenders and private placement note holders, there is no guarantee that such waivers will be forthcoming.   Moreover, if such waivers are obtained, they will probably be granted on terms not at all favorable to ProQuest.

3.   Following the belated disclosures concerning the defendants' false accounting, shares of ProQuest stock plummeted - - falling to below $22.00 per share, down over $7.40 per share compared to the prior day's close of $29.41 per share, a decline of almost 25% in a single trading day.   Almost 13 million shares traded, many times the Company's average daily trading volume.

4.   This volatility and adverse market action was the result of investors having then learned that the Company's previously reported financial results were not true and accurate but, rather, that defendants had knowingly or recklessly or negligently *manipulated, and/or allowed defendants to manipulate, the Company's financial results and "smoothed" reported earnings to create the appearance of controlled growth and sustained profitability during the relevant period.*

5.   In addition to the foregoing, at that time, investors also learned that defendants were not managing the Company's growth without creating substantial volatility, nor was the Company operating according to plan.   This surprised investors because defendants previously touted management's abilities, and the depth of the Company's supporting systems, including its centralized administration infrastructure and proprietary centralized information management systems and technologies, which together wereS purported to allow defendants to monitor such growth and substantiate guidance.   Investors were also shocked and amazed because business

3

and accounting management tools are exactly the type of product which defendants were purporting to sell to Company customers at all relevant times.

6.     Unbeknownst to investors, however, at all relevant times, it was *not* true that the Company was achieving stable, consistent and controlled growth in revenues and earnings. In fact defendants propped up the Company's results by manipulating ProQuest's accounting for royalties and other expenses. Throughout the relevant period, defendants artificially inflated the Company's financial results, or acquiesced in such illegal conduct, in order to hide the fact that ProQuest was suffering from a host of undisclosed adverse factors, that were *already* negatively impacting its business and operations. In particular:

- Throughout the relevant period it was *not* true that the Company was achieving stable, consistent and controlled growth in revenues and earnings, and defendants had created this illusion by manipulating ProQuest's accounting for deferred income and royalty payments, and its improper capitalization of royalty expenses, and/or allowing such manipulation to occur.

- Throughout that time it was also *not* true that defendants maintained adequate systems of internal operational or financial controls within ProQuest, such that the officers and directors of the Company could assure that ProQuest's reported financial statements were true, accurate or reliable.

- As a result of the acts or omissions of defendants, at that time it also was *not* true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules, as ProQuest's financial statements were materially inaccurate and overstated revenue and income from at least 1999 throughout 2005.

- As a result of the foregoing, defendants lacked any reasonable basis to represent that ProQuest was operating according to plan, or that ProQuest could achieve guidance sponsored and/or endorsed by defendants.

7.     As a result of defendants illegal conduct, ProQuest has been significantly and materially damaged. In addition to the foregoing damage defendants caused to the Company's reputation and goodwill, the false statements made by those corporate insiders, which artificially

4

inflated the price of the Company's common stock during the relevant period, have resulted in the corporation being named a defendant in a series of securities fraud class action lawsuits. These class action lawsuits, filed in federal District Court in Michigan, seek huge damages and will cost the Company millions to defend, and likely tens or hundreds of millions more to settle or satisfy.

8.      The illegal activities of certain defendants will make the securities class action suits much more difficult, if not impossible to defend and will provide a basis for ProQuest's directors' and officers' liability insurance carrier to disclaim coverage under the active and deliberate dishonesty exclusion or the insider trading exclusion and/or negotiate a defense expense sharing allocation with ProQuest that will be very unfavorable to the Company.

9.      Moreover, these revelations of illegal and improper accounting and violations of the securities laws have badly damaged ProQuest's corporate image and goodwill. For at least the foreseeable future, ProQuest will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that ProQuest's ability to raise equity capital on favorable terms in the future will be impaired.

10.     Management of ProQuest is antagonistic to this lawsuit and making demand on the Board of Directors would be futile. The ProQuest Board is dominated by defendant Aldworth, who is the senior-most executive officer of the Company, and who is among the primary wrongdoers, as alleged herein – who personally signed or certified the Company's materially false and misleading quarterly and annual financial reports during the relevant period. In addition, other senior executives of the Company engaged in and/or allowed the illegal action

5

within the Company to occur, and the Board as a whole is not willing to bring any action directly against these officers and themselves on behalf of the Company.

11.     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves – something they are unwilling to do. Such a suit would require the directors to expose themselves to a huge multi-million dollar liability to the Corporation, which due to the particular language of currently utilized directors' and officers' liability insurance policies (*i.e.*, the insured vs. insured exclusion) would not be an insured claim, while the claims asserted *via* this derivative action would be insured.

## JURISDICTION AND VENUE

12.     Venue is proper in this District because ProQuest maintains its chief executive offices and principal place of business is located in this District. Moreover, many of ProQuest's public shareholders, who own thousands or even millions of shares of ProQuest stock, reside in this District. This suit is brought here, in part, due to the involvement of violations of the U.S. federal laws in this case, including Sarbanes-Oxley and the SEC accounting rules, and because prosecuting this case in this District will provide the opportunity for convenient discovery, thus affording the parties the opportunity to achieve economies and efficiencies in the conduct of this litigation.

13.     Each Individual Defendant has minimum contacts with this District, as they either reside here or have frequently traveled here on ProQuest business and otherwise, or authorized acts and actions which have had a sufficient impact in this District or on ProQuest's shareholders and investors residing here as to justify the exercise of jurisdiction over them.

14.     The amount in controversy – tens or possibly hundreds of millions of dollars – far exceeds the jurisdictional minimum of this Court.

6

15.     The plaintiff is a citizen and resident of a State in the United States different from defendants, some of whom may be foreign citizens. Complete diversity of citizenship is present and, accordingly, jurisdiction exists under 28 U.S.C. §1332.

## PARTIES

16.     Plaintiff John H. Fringer is, and at all times relevant to the allegations raised herein was, an owner of shares of ProQuest stock. Plaintiff brings this action derivatively in the right of and for the benefit of ProQuest. Plaintiff will fairly and adequately represent the interests of ProQuest and the shareholders of ProQuest in enforcing the rights of the Company. Plaintiff John H. Fringer is a citizen of the state of Virginia.

17.     Nominal Defendant **PROQUEST COMPANY** is a corporation organized under the laws of Delaware, with its principal place of business and chief executive offices located in Ann Arbor, Michigan. According to the Company's profile, ProQuest is a leading publisher of information and education solutions, providing products and services to customers through two business segments: Information and Learning and Business Solutions. The Company's Information and Learning segment, primarily serves the education market, by collecting, organizing and publishing content from a wide range of sources including newspapers, periodicals and books. The Company's Business Solutions segment is primarily engaged in the delivery, in electronic form, of comprehensive parts and service information to the automotive market. ProQuest products also transform complex technical data, like parts catalogs and service manuals, into electronic information. For the world's automotive manufacturers and their dealer networks, ProQuest also offers complex, secure business-to-business information and retail performance management services that provide *real-time information management* of these diverse operations.

7

18.     Defendant **ALAN ALDWORTH** ("Aldworth") is, and during the relevant period was, Chairman of the Board, Chief Executive Officer and President of the Company. During the relevant period, defendanat Aldworth signed the Company's SEC filings, including but not limited to each of ProQuest's Form(s) 10-Q and Form 10-K. Upon information and belief, defendant Aldworth is a citizen of the State of **Michigan**.

19.     Defendant **JAMES P. ROEMER** ("Roemer") is, and during the relevant period was, a member of the Board of Directors of the Company. Defendant Roemer is a long-term Board member, having served as Chairman of the ProQuest Board from 1998 to May 2004, and having served as a member of this Board since 1995. Previously defendant Roemer also served as CEO (1/02 – 1/03), and as President and CEO (2/97 to 1/03). During the relevant period, defendant Roemer also signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2004 Form 10-K. Upon information and belief, defendant Roemer is a citizen of the State of **Michigan**.

20.     Defendant **GARY L. ROUBOS** ("Roubos") is, and during the relevant period was, a member of the Board of Directors of the Company and Chairman of the Audit Committee thereof. During the relevant period, defendant Roubos signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2003 and 2004 Forms 10-K. Upon information and belief, defendant Roubos is a citizen of the State of **Colorado**.

21.     Defendant **DAVID G. BROWN** ("Brown") is, and during the relevant period was, a member of the Board of Directors of the Company. Defendant Brown is a long-term Director of the Company, having served in this capacity since 1994 and a member of the Audit Committee. During the relevant period, defendant Brown signed the Company's SEC filings,

8

including but not limited to ProQuest's fiscal 2003 and 2004 Forms 10-K. Upon information and belief, defendant Brown is a citizen of the State of **Texas.**

22.   Defendant **MICHAEL GELTZEILER** ("Geltzeiler") is, and during the relevant period was, a member of the Board of Directors of the Company and a member of the Audit Committee thereof. During the relevant period, defendant Geltzeiler signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2004 Form 10-K. Upon information and belief, defendant Geltzeiler is a citizen of the State of **Florida**.

23.   Defendant **WILLIAM E. OBERNDORF** ("Oberndorf") is, and during the relevant period was, a member of the Board of Directors of the Company. Defendant Oberndorf is a long-time member of the Board, having served in this capacity since 1998. During the relevant period, defendant Oberndorf signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2003 and 2004 Forms 10-K. Upon information and belief, defendant Oberndorf is a citizen of the State of **California**.

24.   Defendant **LINDA G. ROBERTS** ("Roberts") is, and during the relevant period was, a member of the Board of Directors of the Company. During the relevant period, defendant Roberts signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2003 and 2004 Forms 10-K. Upon information and belief, defendant Roberts is a citizen of the State of **Maryland**.

25.   Defendant **FREDERICK J. SCHWAB** ("Schwab") is, and during the relevant period was, a member of the Board of Directors of the Company. During the relevant period, defendant Schwab signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2004 Form 10-K. Upon information and belief, defendant Schwab is a citizen of the State of **Georgia**.

9

26.     Defendant **TODD S. NELSON** ("Nelson") is, and during the relevant period was, a member of the Board of Directors of the Company.  During the relevant period, defendant Nelson signed the Company's SEC filings, including but not limited to ProQuest's fiscal 2003 and 2004 Forms 10-K. Upon information and belief, defendant Nelosn is a citizen of the State of **Arizona**.

27.     Defendant **RANDY BEST** ("Best") is, and during the relevant period was, a member of the Board of Directors of the Company, having assumed that position at the Company following the January 2005 acquisition of Voyager Expanded Learning by ProQuest.  Prior to this acquisition, defendant Best was chairman and CEO of Voyager.  Upon information and belief, defendant Best is a citizen of the State of **Texas**.

28.     Defendant **KEVIN G. GREGORY** ("Gregory") was, during the relevant period, Chief Financial Officer of the Company.  During the relevant period, defendant Gregory signed the Company's SEC filings, including but not limited to ProQuest's Form(s) 10-Q and Form 10-K. Upon information and belief, defendant Gregory is a citizen of the State of **Michigan**.

29.     Defendant Aldworth and Gregory are referred to herein as the "Officer Defendants."  In addition to the Officer Defendants, the individuals listed herein as defendants, *supra*, are referred to collectively herein as the "Director Defendants" and, collectively with the Officer Defendants, the "Individual Defendants."

## DUTIES OWED BY DIRECTORS & OFFICERS

30.     Each officer and director of ProQuest owed the Company's shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and  administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of ProQuest's directors and officers complained of herein involves gross and reckless

10

misconduct – including culpable violations of their obligations as directors of ProQuest and the absence of good faith on their part for their duties to the Company and its shareholders. The misconduct of the ProQuest's officers has been ratified by ProQuest's Board, which has failed to take any legal action on behalf of the Company against them.

31.     By reason of their positions as officers, directors and/or fiduciaries of ProQuest and because of their ability to control the business and corporate affairs of ProQuest, the Individual Defendants owed ProQuest and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage ProQuest in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of ProQuest and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

32.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, so as to: (i) fulfill their duty of candor and honesty to the existing shareholders of ProQuest; and (ii) so that the market price of ProQuest's stock would be based on truthful and accurate information.

33.     The Individual Defendants, because of their positions of control and authority as directors or officers of ProQuest, were able to and did, directly and indirectly, control the wrongful acts complained of herein, including ProQuest's violations of the U.S. securities laws, as well as the contents of the various public statements issued by the Company to its shareholders and to the investment community. Because of their executive and directorial positions with ProQuest, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and future business prospects of ProQuest

11

and was required to disclose it promptly and accurately to its shareholders and the financial markets, but did *not* do so.

34.    To discharge their duties, the directors of ProQuest were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of ProQuest. By virtue of such duties, the officers and directors of ProQuest were required, among other things, to:

(a)    Manage, conduct, supervise and direct the business affairs of ProQuest in accordance with law (including the U.S. securities laws and the Sarbanes-Oxley Act), government rules and regulations and the charter and bylaws of ProQuest;

(b)    Neither violate nor knowingly permit any officer, director or employee of ProQuest to violate applicable laws, rules and regulations;

(c)    Remain informed as to the status of ProQuest's operations, including its acquisitions and customer financing loans, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S federal securities laws and their duty of candor to its shareholders;

(d)    Establish and maintain systematic and accurate records and reports of the business and affairs of ProQuest and procedures for the reporting of the business and affairs to the Boards of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that ProQuest's financial statements would be accurate and the actions of its directors would be in accordance with all applicable laws;

12

(f)     Exercise reasonable control and supervision over public statements to the securities markets and trading in ProQuest stock by the officers and employees of ProQuest;

(g)     Supervise the preparation and filing of any financial reports or other information required by law from ProQuest and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of ProQuest and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

35.     During all times relevant hereto, each of the defendants occupied a position with ProQuest or was associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning ProQuest and its operations, finances and financial condition.

36.     Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding ProQuest's business and finances had not been disclosed to, and were being concealed from its shareholders and the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding ProQuest and to take any and all action necessary to ensure that the officers and directors of ProQuest did not act upon such privileged non-public information in a manner which caused the Company to violate the law.

37.     Also, because of the Individual Defendants' positions, they knew the adverse non-public information about ProQuest's operations and finances, as well as its accounting practices, markets and business prospects *via* access to internal corporate documents (including ProQuest's financial statements, operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, and attendance at

13

management and board of directors' meetings and committees thereof *via* reports and other information provided to them in connection therewith. Each of the Individual Defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to ProQuest shareholders.

## SUBSTANTIVE ALLEGATIONS

### The Truth About The Company Emerges

38.     On February 9, 2006, prior to the opening of trading, defendants caused the Company to publish a release which stated that ProQuest would be forced to restate its previously reported financial results as a result of *discovering "material irregularities" in the Company's accounting.* This release stated, in part, the following:

ProQuest Company to Restate Historical Financial Statements

ANN ARBOR, Mich., Feb 09, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- ProQuest Company (NYSE: PQE), a publisher of information and education solutions, announced that during a review related to its internal controls assessment required by the Sarbanes-Oxley Act of 2002, *the company discovered material irregularities in its accounting. As a result, the company intends to restate certain of its previously issued financial statements.*

*The accounting irregularities that have been identified primarily affect ProQuest's Information and Learning division.* While the results for the Voyager Expanded Learning business have been included in the segment results for the Information and Learning business unit since the first quarter 2005, *the accounting irregularities do not involve Voyager.*

*Based upon its initial findings, the company believes that its deferred income and accrued royalty accounts are materially understated in previously issued financial statements. It also believes that its prepaid royalty account is materially overstated. It anticipates that as a result it will be required to recognize amounts of royalty and other expenses as well as reduce a portion of revenues previously reported for its Information and Learning business, the effect of which will materially reduce earnings from continuing operations for many of the affected periods....*

14

\* \* \*

*Until the review is complete, the company's previously issued financial statements for fiscal years 1999 through 2004, quarterly periods in 2005, and the company's guidance for fiscal 2005, should no longer be relied upon.* In addition, the company's review is ongoing and there can be no assurance additional material irregularities or errors will not be identified.

While the Audit Committee believes a restatement will be required, it has not yet determined the time periods involved or the amount of the accounting restatement. [Emphasis added.]

39.     In addition to the foregoing, as a result of this restatement, defendants also revealed that the Company was no longer in compliance with certain covenants, and representations and warranties of its revolving credit agreement and its private-placement debt. Defendants also revealed that the Company's financial covenants and representations made with regard to previously issued financial statements were also false and materially misleading. While defendants stated that it would then be necessary to secure waivers from its revolving credit agreement lenders and private placement note holders, there is no guarantee that such waivers will be forthcoming.   Moreover, even if such waivers can be procured, they will probably be granted on terms not at all favorable to ProQuest.

40.     Following the belated disclosures concerning the defendants' false accounting, shares of ProQuest stock plummeted - - falling to below $22.00 per share, down over $7.40 per share compared to the prior day's close of $29.41 per share, a decline of almost 25% in a single trading day.   Almost 13 million shares traded, many times the Company's average daily trading volume.

41.     As investors ultimately learned, the true but undisclosed facts about the Company, which defendants knew or recklessly or negligently disregarded, and which defendants had failed to disclose to investors during the relevant period, included, in part, the following:

15

(a)     At that time it was *not* true that the Company was achieving stable, consistent and controlled growth in revenues and earnings, and defendants had created this illusion by manipulating ProQuest's accounting for deferred income and royalty payments and its improper capitalization of royalty expenses, and/or allowing such manipulation to occur;

(b)     At that time it was also *not* true that defendants maintained adequate systems of internal operational or financial controls within ProQuest, such that the officers and directors of the Company could assure that ProQuest's reported financial statements were true, accurate or reliable;

(c)     As a result of the acts or omissions of defendants, at that time it also was *not* true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules, as ProQuest's financial statements were materially inaccurate and overstated revenue and income from at least 1999 throughout 2005.; and

(d)     As a result of the above, defendants lacked any reasonable basis to claim that ProQuest was operating according to guidance sponsored and/or endorsed by defendants or that the Company could achieve such guidance.

## Defendants' Materially False and Misleading Statements Made During the Relevant Period

42.     The market for ProQuest's common stock was open, well-developed and efficient at all relevant times. Defendants' publication, or acquiescence in such publication, of materially false and misleading statements during the relevant period, however, caused ProQuest common stock to trade at artificially inflated prices. Many investors then purchased or otherwise acquired ProQuest common stock during the relevant period relying upon the integrity of the market price of ProQuest common stock and market information relating to ProQuest, and those shareholders have also sustained damages and losses.

16

43.     Moreover, during the relevant period, defendants beached their fiduciary duties to plaintiff and other Company shareholders and materially misled the investing public, thereby inflating the price of ProQuest common stock by publicly issuing false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.  Examples of such materially false and materially misleading statements are, in part, particularized below.

44.     On April 22, 2003, the inception of the relevant period, defendants caused ProQuest to publish a release which announced purported results for the first quarter ended March 29, 2003.  According to defendants, the Company had achieved "Strong Cash Flow" for the quarter in addition to reporting, in part, the following:

**First Quarter 2003 Highlights**

- Revenues were up 9 percent to $111.8 million, compared with $102.8 million in the first quarter of 2002.

- EBIT was $22.2 million for the quarter, an increase of 8 percent over 2002 first quarter EBIT of $20.5 million.

- Net earnings for the quarter increased 35 percent to $11.2 million, or $0.40 per fully diluted share, compared with net earnings of $8.3 million or $0.34 per fully diluted share one year ago.

- First quarter operating cash flow was $27.3 million, including a $13 million tax refund, for an improvement of $31.8 million over the first quarter of 2002.

"ProQuest generated strong operating cash flow in the first quarter as a result of our 35 percent net earnings growth. This cash flow improvement includes a refund of tax and accrued interest of approximately $13.0 million from the IRS, strong collections of accounts receivable, and the positive impact from the timing of payments on accrued expenses," said Kevin Gregory, ProQuest's senior vice president and chief financial officer. [Emphasis added.]

17

45.   On or about May 13, 2003, defendants caused to be filed with the SEC the Company's 1Q:03 Form 10-Q for the quarter ended March 29, 2003, signed and certified by defendants Gregory and Aldworth.   In addition to reiterating statements similar to those contained in the Company's April 22, 2003 release concerning the Company's year-over-year comparisons and financial results, in the Company's 1Q:03 Form 10-Q defendants also stated, in part, the following:

### Note 1—Basis of Presentation

The Consolidated Financial Statements include the accounts of ProQuest Company and its subsidiaries, including ProQuest Information & Learning ("PQIL") and ProQuest Business Solutions ("PQBS"), and are unaudited.

As permitted under the Securities and Exchange Commission ("SEC") requirements for interim reporting, certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been omitted. Certain reclassifications to the 2002 Consolidated Financial Statements have been made to conform to the 2003 presentation. *We believe that these financial statements include all necessary and recurring adjustments for the fair presentation of the interim period results.* These financial statements should be read in conjunction with the Consolidated Financial Statements and related notes included in our annual report for the fiscal year ended December 28, 2002. [Emphasis added.]

46.   In addition to the foregoing, defendants also caused the Company's 1Q:03 Form 10-Q to contain statements concerning ProQuest's controls and procedures, as follows:

Item 4. DISCLOSURE CONTROLS AND PROCEDURES

### Item 4.

### Controls and Procedures

Based on a recent evaluation, which was completed within 90 days of the filing of this Form 10-Q, *our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) are effective to ensure that information required to be disclosed in the reports that we file or submit under the Securities*

*Exchange Act of 1934* is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. There have been no significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the date of the previously mentioned evaluation. [Emphasis added.]

47.     The Company's 1Q:03 Form 10-Q also contained certifications signed by defendants Gregory and Aldworth, which also attested to the purported accuracy and completeness of the Company's financial and operational reports.    In this regard, the Certifications stated, in part, the following:

## CERTIFICATIONS

1. I have reviewed this quarterly report on Form 10-Q of ProQuest Company;

2. Based on my knowledge, *this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this quarterly report;

3. Based on my knowledge, *the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

        a)      *designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this quarterly report is being prepared;

        b)      *evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report* (the "Evaluation Date"); and

        c)      presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

        a)      *all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls*; and

        b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.      The registrant's other certifying officers and I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: May 13, 2003

                     /S/   **ALAN W. ALDWORTH**
                     President and Chief Executive Officer

                              *    *    *

Date: May 13, 2003

                     /S/   **KEVIN G. GREGORY**
                     Senior Vice President, Chief Financial Officer

**Exhibit 99.1**

**Certification Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report of ProQuest Company (the "Company") on Form 10-Q for the period ending March 29, 2003 (the "Report"), the undersigned Chief Executive Officer of the Company hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002 that based on his knowledge: 1) the Report fully complies with the requirements of Section 13 (a) or 15(d) of the Securities Exchange Act of 1934, and 2) *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report.*

/S/   **ALAN W. ALDWORTH**

20

President and Chief Executive Officer
May 13, 2003

**Certification Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report of ProQuest Company (the "Company") on Form 10-Q for the period ending March 29, 2003 hereof (the "Report"), the undersigned Chief Financial Officer of the Company hereby certifies, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002 that based on his knowledge: 1) the Report fully complies with the requirements of Section 13 (a) or 15(d) of the Securities Exchange Act of 1934, and 2) *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report.*

/S/   **KEVIN G. GREGORY**
Kevin Gregory, Senior Vice President, Chief Financial Officer and Assistant Secretary
May 13, 2003                                    [Emphasis added.]

48.     On July 22, 2003, defendants caused the Company to issued a release entitled

"ProQuest Reports Revenue Growth of 6% and Earnings Per Share of $0.43 for the Second

Quarter of 2003," ended June 28, 2003. This release also stated in part, the following:

**Second Quarter 2003 Highlights**

- Revenues were $115.1 million, compared with $109.0 million in the second quarter of 2002.

- EBIT was $23.7 million for the quarter, compared with 2002 second quarter EBIT of $23.3 million.

- Net earnings for the quarter increased 21 percent to $12.3 million, or $0.43 per fully diluted share, compared with net earnings of $10.2 million or $0.40 per fully diluted share one year ago.

- Free cash flow, which the company defines as operating cash flow less capital expenditures and software spending, was a use of $15.9 million for the quarter, compared with a use of $17.6 million in the second quarter of 2002, an improvement of $1.7 million.

- Capital expenditures were $8.8 million, compared to $14.2 million for the second quarter of 2002, a reduction of 38 percent.

- Software spending was $3.4 million, compared to $6.6 million for the second quarter of 2002, a reduction of 48 percent.

- At June 28, 2003, debt, net of cash and cash equivalents was $217.3 million, an increase of $11.7 million over the first quarter of 2003.

## ProQuest Information and Learning

Information and Learning's second quarter revenues increased 6 percent to $68.9 million, compared with $65.0 million one year ago. Second quarter EBIT of $13.4 million increased 2 percent compared with $13.1 million in the year- ago quarter. "As expected, EBIT growth was impacted by a $2.8 million increase in depreciation and amortization expense compared to the second quarter of 2002," said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company. "This additional depreciation and amortization is the result of investments for new products that are entering the market," added Gregory.

49.    On or about August 11, 2003, defendants caused to be filed with the SEC the Company's 2Q:03 Form 10-Q for the quarter ended June 28, 2003, signed and certified by defendants Gregory and Aldworth. The 2Q:03 Form 10-Q reiterated statements similar to those contained in the Company's July 22, 2003 release concerning the Company's year-over-year comparisons and financial results. Defendants also caused the Company's 2Q:03 Form 10-Q to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC. This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

50.    On October 21, 2003, defendants caused the Company to publish a release entitled "ProQuest Reports Revenue Growth of 10% and Earnings Per Share of $0.41 for the Third Quarter of 2003," ended September 27, 2003.    This release also stated in part, the following:

22

*"We've been focused on ProQuest Company's strategic priorities all year, which were to grow revenues, reduce costs, increase free cash flow, make strategic acquisitions, and bring new products to market,"* said Alan Aldworth, president and chief executive officer of ProQuest Company. *"Our execution during the third quarter was excellent,"* Aldworth added.

**Third Quarter 2003 Highlights**

- Revenues were $116.7 million, compared with $106.4 million in the third quarter of 2002.

- EBIT was $22.3 million for the quarter, compared with 2002 third quarter EBIT of $21.9 million.

- Net earnings for the quarter were $11.7 million, or $0.41 per fully diluted share, compared with pro forma net earnings of $11.1 million or $0.39 per fully diluted share one year ago. Pro forma net earnings for the third quarter of 2002 exclude a one-time charge of $5.1 million after tax, or $0.18 per share, related to the settlement of interest rate swaps during that quarter.

- Free cash flow of $14.6 million was generated during the quarter, compared with $2.1 million generated in the third quarter of 2002, an improvement of $12.5 million. (The company defines free cash flow as operating cash flow less capital expenditures and software spending.)

- Capital expenditures and software spending decreased 8 percent to $19.2 million, from $20.8 million in the third quarter of 2002.

- Debt, net of cash during the quarter increased $12.9 million to $230.2 million. This was primarily the result of a debt increase for the SIRS acquisition offset by cash generated from operations during the quarter.

ProQuest's third quarter net earnings include charges of $0.9 million for severance expense, and $0.4 million in compensation expense for an executive incentive compensation plan based on our stock price," said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company. "Excluding these two items, ProQuest's third quarter fully diluted earnings per share was $0.44," Gregory added.

**ProQuest Business Solutions**

At Business Solutions, third quarter revenues increased 6 percent to $47.6 million, compared with $44.7 million in the third quarter of 2002. Third quarter 2003 EBIT was $14.6 million, an increase of 11 percent over EBIT of $13.2 million in the third quarter of 2002. [Emphasis added.]

51.    On or about November 10, 2003, defendants caused to be filed with the SEC the Company's 3Q:03 Form 10-Q for the quarter ended September 27, 2003, signed and certified by defendants Gregory and Aldworth. The 3Q:03 Form 10-Q reiterated statements similar to those contained in the Company's October 21, 2003 release concerning the Company's year-over-year comparisons and financial results. Defendants also caused the Company's 3Q:03 Form 10-Q to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC. This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

52.    On February 19, 2004, defendants caused the Company to issue a release entitled "ProQuest Company Reports Growth in Revenue, Earnings And Operating Cash Flow for 2003," the fiscal year ended January 3, 2004. This release stated, in part, the following:

For the full year 2003, revenue grew to $469.7 million, a 10 percent increase over 2002. Net earnings were $49.8 million, up 13 percent over pro forma 2002. Earnings per share were $1.75 per fully diluted share, up 6 percent over pro forma 2002 earnings of $1.65. During 2003, the company took a charge of $1.5 million after-tax for an executive's compensation plan based on stock price. Excluding this charge, pro forma net earnings were up 17 percent to $51.3 million, or $1.80 per fully diluted share. Cash flow from operations was $119.6 million for the full year, up $49.3 million over 2002.

*"We made excellent progress on many important fronts this year.* We entered content agreements with prestigious publishing partners, introduced new products and product enhancements that were well received by our markets, and signed new and renewed agreements with several of the world's top automotive OEMs. During 2003, we significantly increased our presence in the growing K-12 market with the acquisitions of Bigchalk and SIRS Publishing," said Alan Aldworth, president and chief executive officer of ProQuest Company.

24

Aldworth continued, *"We believe that the ProQuest business model is capable of generating significant free cash flow.* During 2003, we surpassed the high end of our free cash flow guidance, generating $48.8 million. *I am very pleased with ProQuest's 2003 performance."* [Emphasis added.]

53.     On or about March 18, 2004, defendants caused to be filed with the SEC the Company's Form 10-K for the quarter fiscal year ended January 3, 2004, certified by defendants Gregory and Aldworth and signed by all current directors of the Company. The 2003 Form 10-K reiterated statements similar to those contained in the Company's February 19, 2004 release concerning the Company's year-over-year comparisons and financial results.  Defendants also caused the Company's 2003 Form 10-K to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC.  This Form 10-K also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.  In addition to the foregoing, the Company's 2003 Form 10-K also incorporated the report by the Audit Committee of the Company, filed previously with the SEC in the Company's annual Proxy Statement.

54.     On April 20, 2004, defendants caused the Company to publish a release entitled "ProQuest Company Reports Growth in Revenue and Net Earnings for the First Quarter of 2004," ended April 3, 2004.  This release stated, in part, the following:

**First Quarter Financial Review**

- Revenue increased 4 percent to $116.2 million, compared to $111.8 million for the prior year's first quarter.

- EBIT (earnings before interest and income taxes) was $21.9 million versus $22.2 million for the first quarter of 2003, a decrease of $0.3 million.

- EBITDA (earnings before interest, income taxes, depreciation and amortization) increased 3 percent to $38.3 million, compared to $37.1 million for the first quarter of 2003.

25

- Net earnings increased 3 percent to $11.5 million or $0.40 per fully diluted share, versus net earnings of $11.2 million or $0.40 per fully diluted share in the first quarter of fiscal 2003.

- Operating cash flow was a use of $0.6 million, a decrease of $28.3 million over the prior year's first quarter which included a tax refund of $13.1 million. Excluding this prior year tax refund, operating cash flow decreased $15.2 million.

- Free cash flow (operating cash flow less expenditures for property, plant, equipment, product masters and software) was a use of $21.3 million, a decrease of $26.9 million over the first quarter of fiscal 2003 which included a tax refund of $13.1 million. Excluding this prior year tax refund, free cash flow decreased by $13.8 million.

- Expenditures for property, plant, equipment, product masters and software decreased 6 percent to $20.7 million from $22.1 million in the prior year's first quarter. These expenditures were 18 percent of revenue in the first quarter of 2004 versus 20 percent of revenue in the first quarter of 2003.

*"The cash flow results for the first quarter are consistent with the company's cash flow outlook for the year.* As anticipated, the decrease in cash flow is primarily the result of the first quarter ending five days later than it did in 2003, pulling certain payments into the first quarter of 2004 that were made at the beginning of the second quarter in 2003," said Kevin Gregory, ProQuest Company's senior vice president and chief financial officer. [Emphasis added.]

55.     On or about May 13, 2004, defendants caused to be filed with the SEC the Company's 1Q:04 Form 10-Q for the quarter ended April 3, 2004, signed and certified by defendants Gregory and Aldworth. The 1Q:04 Form 10-Q reiterated statements similar to those contained in the Company's April 20, 2004 release concerning the Company's year-over-year comparisons and financial results.  Defendants also caused the Company's 1Q:04 Form 10-Q to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC.  This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

56.   On July 22, 2004, defendants caused the Company to published a release entitled "ProQuest Company Reports 13% Earnings Growth for the Second Quarter of 2004," ended July 3, 2004. This release stated, in part, the following:

**Second Quarter Financial Results**

- Revenue from continuing operations increased 1 percent to $112.2 million, from $110.7 million in the prior year's second quarter.

- EBIT from continuing operations (earnings from continuing operations before interest and income taxes) increased 7 percent to $23.7 million, from $22.2 million in the second quarter of 2003.

- EBITDA from continuing operations (earnings from continuing operations before interest, income taxes, depreciation and amortization) increased 9 percent over the second quarter of 2003 to $39.7 million, from $36.5 million in the second quarter of 2003.

- Earnings from continuing operations increased 13 percent to $12.9 million or $0.45 per fully diluted share, versus earnings from continuing operations of $11.4 million or $0.40 per fully diluted share in the second quarter of fiscal 2003.

- Operating cash flow of $19.2 million was generated in the second quarter, an increase of $22.6 million versus a use of $3.4 million in the prior year's second quarter.

- Free cash flow (operating cash flow less expenditures for property, plant, equipment, product masters and software) of $0.9 million was generated in the second quarter, an increase of $16.5 million versus a use of $15.6 million in the second quarter of fiscal 2003.

- Expenditures for property, plant, equipment, product masters and software were $18.3 million, versus $12.2 million in the prior year's second quarter.

57.   On or about August 12, 2004, defendants caused to be filed with the SEC the Company's 2Q:04 Form 10-Q for the quarter ended July 3, 2004, signed and certified by defendants Gregory and Aldworth. The 2Q:04 Form 10-Q reiterated statements similar to those contained in the Company's July 22, 2004 release concerning the Company's year-over-year

27

comparisons and financial results. Defendants also caused the Company's 2Q:04 Form 10-Q to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC. This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

58.     On October 21, 2004, defendants caused the Company to publish a release entitled "ProQuest Company Reports 11% Earnings Growth for the Third Quarter of 2004," ended October 2, 2004. This release also stated, in part, the following:

> *"Our earnings performance was in line with our expected 10 to 13 percent growth. Revenue from our published products continues to show healthy growth.* However, declines in revenue from general reference databases and non-recurring revenue products continue to pressure overall revenue growth," said Alan Aldworth, ProQuest Company's chairman and chief executive officer. *"The strategic initiatives that will drive ProQuest Company's long-term growth* are: investing in our electronic publishing business, making acquisitions that strengthen and extend our product lines and market reach, and continuing to make productivity improvements. *We continue to make progress on each of these initiatives,"* added Aldworth.

> **Third Quarter Financial Results**

> As previously disclosed, ProQuest Company sold its powersports dealer management system business during the second quarter of 2004. In accordance with generally accepted accounting principles (GAAP), income statement amounts for 2004 and 2003 have been adjusted to classify the results of this business as a discontinued operation.

> - Revenue from continuing operations increased to $113.1 million, from $112.3 million in the prior year's third quarter.

> - EBIT from continuing operations (earnings from continuing operations before interest and income taxes) increased 7 percent to $22.5 million, from $21.0 million in the third quarter of 2003.

> - EBITDA from continuing operations (earnings from continuing operations before interest, income taxes, depreciation and amortization) increased 14 percent over the third quarter of 2003 to $41.7 million, from $36.7 million in the third quarter of 2003.

- Earnings from continuing operations increased 11 percent to $12.2 million or $0.42 per fully diluted share, versus earnings from continuing operations of $11.0 million or $0.38 per fully diluted share in the third quarter of fiscal 2003.

- Operating cash flow of $24.6 million ws generated in the third quarter, versus $34.0 million generated in the prior year's third quarter.

- Expenditures for property, plant, equipment, product masters and software were $13.6 million, versus $19.2 million in the prior year's third quarter.

- Free cash flow (operating cash flow less expenditures for property, plant, equipment, product masters and software, and plus proceeds from fixed asset dispositions) of $11.9 million was generated in the third quarter compared to $14.8 million generated in the third quarter of fiscal 2003.

*"Overall we had mixed results for the quarter. Earnings growth was strong, however, revenue growth during the quarter was less than anticipated,"* said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company. "At Information and Learning, third quarter revenue growth remained consistent with the growth seen in the first two quarters. The strong revenue growth from published products and the normal uptick in sales at the start of the new school year was not enough to offset the continued declines in our general reference products. While recurring revenue is strong at Business Solutions, we experienced declines in nonrecurring hardware and contract development revenue," Gregory added. [Emphasis added.]

59.    On or about November 12, 2004, defendants caused to be filed with the SEC the Company's 3Q:04 Form 10-Q for the quarter ended October 2, 2004, signed and certified by defendants Gregory and Aldworth. The 3Q:04 Form 10-Q reiterated statements similar to those contained in the Company's October 21, 2004 release concerning the Company's year-over-year comparisons and financial results. Defendants also caused the Company's 3Q:04 Form 10-Q to contains statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC. This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

29

60.     On February 24, 2005, defendants caused the Company to publish a release

entitled "ProQuest Company Reports 13% Increase in Earnings for 2004; Fourth Quarter

Revenue Increased 5% and Earnings Increased 23%." This release also stated, in part, the

following:

> *"Both of our business segments had solid fourth quarter results. We had a*
> *strong close to the year and achieved 3 percent revenue growth for 2004,"* said
> Alan Aldworth, ProQuest Company's chairman and chief executive officer.
> "There were many positive developments in the fourth quarter including
> continued growth in our published products, improved library budgets, and the
> acquisition of Voyager Expanded Learning. *In light of these developments, we*
> *expect solid results for 2005,"* Aldworth added.
>
> **Fourth Quarter Financial Results**
>
> - Revenue from continuing operations increased 5 percent to $126.7 million
>   from $120.5 million in the prior year's fourth quarter.
>
> - EBIT from continuing operations (earnings from continuing operations
>   before interest and income taxes) increased 17 percent to $29.2 million
>   from $25.0 million in the fourth quarter of 2003.
>
> - EBITDA from continuing operations (earnings from continuing operations
>   before interest, income taxes, depreciation and amortization) increased 21
>   percent to $48.9 million from $40.4 million in the fourth quarter of 2003.
>
> - Earnings from continuing operations increased 23 percent to $16.8 million
>   or $0.58 per fully diluted share versus $13.7 million or $0.48 per fully
>   diluted share in the fourth quarter of fiscal 2003.
>
> - Operating cash flow was $64.6 million versus $62.7 million in the prior
>   year's fourth quarter.
>
> - Expenditures for property, plant, equipment, product masters and software
>   were $14.2 million versus $17.3 million in the prior year's fourth quarter.
>
> - Free cash flow (operating cash flow less expenditures for property, plant,
>   equipment, product masters and software) was $50.4 million compared to
>   $45.4 million in the fourth quarter of fiscal 2003.
>
> *"In the fourth quarter, our published products continued to experience double-*
> *digit revenue growth and renewal rates were strong,"* said Kevin Gregory, senior
> vice president and chief financial officer of ProQuest Company. "While overall

microfilm revenue declined, we had another quarter of increased microfilm backfile sales. Business Solutions revenue showed renewed growth in the fourth quarter, driven primarily by our performance management products," Gregory added. [Emphasis added.]

61.     On or about March 17, 2005, defendants caused to be filed with the SEC the Company's Form 10-K for the fiscal year ended January 1, 2005, certified by defendants Gregory and Aldworth and signed by all current directors of the Company. The 2004 Form 10-K reiterated statements similar to those contained in the Company's February 24, 2005 release concerning the Company's year-over-year comparisons and financial results. Defendants also caused the Company's 2004 Form 10-K to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC. This Form 10-K also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed. In addition to the foregoing, the Company's 2004 Form 10-K also incorporated the report by the Audit Committee of the Company, filed previously with the SEC in the Company's annual Proxy Statement.

62.     On April 28, 2005, defendants caused the Company to publish a release entitled "ProQuest Company First Quarter Revenue Up 9%." This release stated, in part, the following:

> ProQuest Company, a leading publisher of information solutions for the education and automotive markets, reported a 9 percent increase in revenue from continuing operations for the first quarter of 2005. Earnings from continuing operations for the quarter were $7.8 million and earnings per share were $0.26.
>
> "An important initiative in the first quarter was the acquisition and integration of Voyager Expanded Learning. The acquisition was closed on January 31, and the integration has gone well," said Alan Aldworth, ProQuest Company's chairman and chief executive officer. ***"Strong performance from Information and Learning, including Voyager, and Business Solutions resulted in a good start to the year. With this solid beginning to 2005, we are reiterating our full year guidance,"*** said Aldworth.

31

**First Quarter Financial Results**

- Revenue from continuing operations increased 9 percent to $121.1 million from $110.8 million in the prior year's first quarter.

- EBIT from continuing operations (earnings from continuing operations before interest and income taxes) decreased 10 percent to $18.8 million from $20.8 million in the first quarter of 2004. Excluding the dilutive impact of Voyager Learning – which includes the effect of the timing of the transaction and its associated additional costs for amortization of intangibles – EBIT was $22.4 million, an increase of 8 percent over the previous year's first quarter.

- EBITDA from continuing operations (earnings from continuing operations before interest, income taxes, depreciation and amortization) increased 1 percent to $37.2 million from $36.9 million in the first quarter of 2004. Excluding the dilutive impact of Voyager Learning – which includes the effect of the timing of the transaction – EBITDA was $38.8 million, an increase of 5 percent over the first quarter of 2004.

- Earnings from continuing operations decreased 28 percent to $7.8 million or $0.26 per fully diluted share versus $10.9 million or $0.38 per fully diluted share in the first quarter of fiscal 2004. Excluding the dilutive impact of Voyager Learning – which includes the effect of the timing of the transaction and its associated additional costs for interest and amortization of intangibles – earnings from continuing operations grew to $11.9 million, an increase of 9 percent over the first quarter of 2004.

- Operating cash flow was a use of $0.1 million compared to a use of $0.6 million in the prior year's first quarter.

- Expenditures for property, plant, equipment, product masters, curriculum development costs and software were $24.2 million versus $20.7 million in the prior year's first quarter.

- Free cash flow (operating cash flow from continuing operations less expenditures for property, plant, equipment, product masters, curriculum development costs and software plus proceeds from asset dispositions) was a use of $24.3 million compared to a use of $21.3 million in the first quarter of fiscal 2004.

"Voyager contributed $6.0 million in revenue for their first two full months as part of ProQuest," said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company. "As expected, the acquisition had a dilutive impact on first quarter earnings of approximately fifteen cents as a result of additional costs for interest and amortization of intangibles. Also, consistent with the K-12

curriculum industry, Voyager's first quarter has historically generated the lowest revenue," Gregory continued. "*Voyager's performance in the first quarter reaffirms our expectation that this acquisition will be accretive for the full year*," Gregory noted. [Emphasis added.]

63.    On or about May 12, 2005, defendants caused to be filed with the SEC the Company's 1Q:05 Form 10-Q, signed and certified by defendants Gregory and Aldworth. The 1Q:05 Form 10-Q reiterated statements similar to those contained in the Company's April 28, 2005 release concerning the Company's year-over-year comparisons and financial results. Defendants also caused the Company's 1Q:05 Form 10-Q to contain statements regarding the Company's compliance with GAAP and regarding its purported controls and procedures, which were the same as or substantially similar to those filed previously with the SEC. This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

64.    On July 28, 2005, defendants caused the Company to publish a release entitled "ProQuest Company Reports 25% Revenue Growth for the Second Quarter of 2005," ended July 2, 2005. This release also stated, in part, the following:

> ProQuest Company, a leading publisher of information and education solutions, *reported strong increases in revenue from continuing operations for the thirteen and twenty-six week periods ended July 2, 2005*. Revenue from continuing operations was $140.4 million for the second quarter and $261.5 million for the first half of 2005. Earnings from continuing operations were $12.3 million or $0.41 per fully diluted share for the second quarter. For the first half of 2005, earnings from continuing operations were $20.1 million or $0.67 per fully diluted share.
>
> *"In its first full quarter with ProQuest Company, Voyager Learning grew in every aspect*. Voyager Learning added more than 250 new school districts and renewal rates were strong. We also increased our penetration in existing districts and introduced new products," said Alan Aldworth, ProQuest Company's chairman and chief executive officer.
>
> "Overall at ProQuest Company, the products that drive our growth – K-12 classroom solutions, digital published products, digital news products and

automotive information solutions – generated double-digit revenue growth. *Based on the results in the first half of the year, we remain confident in our full-year guidance,*" added Aldworth.

## Second Quarter Financial Results

- Revenue from continuing operations increased 25 percent to $140.4 million from $112.2 million in the prior year's second quarter.

- EBIT from continuing operations (earnings from continuing operations before interest and income taxes) increased 16 percent to $27.4 million from $23.7 million in the second quarter of 2004.

- EBITDA from continuing operations (earnings from continuing operations before interest, income taxes, depreciation and amortization) increased 18 percent to $46.7 million from $39.7 million in the second quarter of 2004.

- Earnings from continuing operations were $12.3 million or $0.41 per fully diluted share, a decrease of 5 percent. This compares to $12.9 million or $0.45 per fully diluted share in the second quarter of fiscal 2004.

- Operating cash flow was $18.4 million compared to $19.2 million in the prior year's second quarter.

- Expenditures for property, plant, equipment, product masters, curriculum development costs and software were $23.5 million versus $18.3 million in the prior year's second quarter.

- Free cash flow (operating cash flow from continuing operations less expenditures for property, plant, equipment, product masters, curriculum development costs and software plus proceeds from asset dispositions) was a use of $5.1 million compared to $0.9 million generated in the second quarter of fiscal 2004.

*"ProQuest Company's second quarter growth was driven by $23 million in revenue from Voyager Learning and 17 percent growth in published products,"* said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company.

*"Strong earnings performance at Information and Learning was partially offset by lower earnings at Business Solutions.* We made investments during the quarter for deployment of new automotive parts and service products and performance management projects. We are also investing in the new Syncata solutions acquired in the first quarter and as a result, there has been a short-term adverse impact on Business Solutions' profit margins. *We expect revenue and*

34

*earnings growth to benefit from these projects in the second half of the year
and beyond,"* added Gregory. [Emphasis added.]

65.    On or about August 10, 2005, defendants caused to be filed with the SEC the

Company's 2Q:05 Form 10-Q for the quarter ended July 2, 2005, signed and certified by

defendants Gregory and Aldworth. The 2Q:05 Form 10-Q reiterated statements similar to those

contained in the Company's July 28, 2005 release concerning the Company's year-over-year

comparisons and financial results.  Defendants also caused the Company's 2Q:05 Form 10-Q to

contain statements regarding the Company's compliance with GAAP and regarding its purported

controls and procedures, which were the same as or substantially similar to those filed previously

with the SEC.   This Form 10-Q also included certifications and Sarbanes-Oxley statements

which were the same as or substantially similar to those previously filed.

66.    On October 27, 2005, defendants caused the Company to publish a release

entitled "ProQuest Reports Revenue of $159.4 Million, Earnings Per Share of $0.60 for Third

Quarter 2005," ended October 1, 2005.  This release stated, in part, the following:

> *"ProQuest Company's revenue and earnings increased in the third quarter of
> 2005 despite the previously disclosed impact of Hurricanes Katrina and Rita
> and earnings dilution from acquisitions and investments made at Business
> Solutions,"* said Alan Aldworth, chairman and chief executive officer of ProQuest
> Company.

**Third Quarter Financial Results**

- Revenue from continuing operations increased 41 percent to $159.4
  million from $113.1 million in the prior year's third quarter.

- EBIT from continuing operations (earnings from continuing operations
  before interest and income taxes) increased 63 percent to $35.3 million
  from $21.6 million in the third quarter of 2004.

- EBITDA from continuing operations (earnings from continuing operations
  before interest, income taxes, depreciation and amortization) increased 48
  percent to $60.3 million from $40.8 million in the third quarter of 2004.

35

- Earnings from continuing operations were $18.2 million or $0.60 per fully diluted share, an increase of 57 percent. This compares to pro forma earnings of $11.6 million or $0.40 per fully diluted share in the third quarter of fiscal 2004.

- Operating cash flow was $16.4 million compared to $24.6 million in the prior year's third quarter.

- Expenditures for property, plant, equipment, product masters, curriculum development costs and software were $14.9 million versus $13.6 million in the prior year's third quarter.

- Free cash flow (operating cash flow from continuing operations less expenditures for property, plant, equipment, product masters, curriculum development costs and software plus proceeds from asset dispositions) was $1.5 million compared to $11.9 million generated in the third quarter of fiscal 2004.

"In the third quarter, Voyager was adversely impacted by Hurricanes Katrina and Rita as well as a recent change to decentralized purchasing in the New York City school district. Excluding these events Voyager performed well and continued to realize strong renewals. Voyager solutions are now in more than 850 school districts nationwide, an increase of more than 40 percent versus the same time last year," said Aldworth.

"***Business Solutions' revenue growth continues to be strong***, with an increase of 10 percent. However, dilution from recent acquisitions and one- time charges related to our General Motors agreement had an adverse impact on third quarter earnings," said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company. [Emphasis added.]

67.     On or about November 10, 2005, defendants caused to be filed with the SEC the

Company's 3Q:05 Form 10-Q for the quarter ended October 1, 2005, signed and certified by

defendants Gregory and Aldworth. The 3Q:05 Form 10-Q reiterated statements similar to those

contained in the Company's October 27, 2005 release concerning the Company's year-over-year

comparisons and financial results. Defendants also caused the Company's 3Q:05 Form 10-Q to

contain statements regarding the Company's compliance with GAAP and regarding its purported

controls and procedures, which were the same as or substantially similar to those filed previously

with the SEC. This Form 10-Q also included certifications and Sarbanes-Oxley statements which were the same as or substantially similar to those previously filed.

68.     On February 8, 2006, the day prior to the end of the relevant period, ProQuest's stock closed at $29.41 per share.

69.     Unbeknownst to investors, however, the statements made by defendants during the relevant period and referenced, in part, above, were each materially false and misleading for the following reasons, among others:

(a)     At that time it was *not* true that the Company was achieving stable, consistent and controlled growth in revenues and earnings, and defendants had created this illusion by manipulating ProQuest's accounting for deferred income and royalty payments, and its improper capitalization of royalty expenses, and/or allowing such manipulation to occur;

(b)     At that time it was also *not* true that defendants maintained adequate systems of internal operational or financial controls within ProQuest, such that the officers and directors of the Company could assure that ProQuest's reported financial statements were true, accurate or reliable;

(c)     As a result of the acts or omissions of defendants, at that time it also was *not* true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules, as ProQuest's financial statements were materially inaccurate and overstated revenue and income from at least 1999 throughout 2005; and

(d)     As a result of the foregoing, defendants lacked any reasonable basis to claim that ProQuest was operating according to guidance sponsored and/or endorsed by defendants, or that the Company could achieve such guidance.

37

70.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other investors. As described herein, during the relevant period, defendants made or caused to be made a series of materially false or misleading statements about ProQuest's business, prospects and operations.

71.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ProQuest and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the relevant period resulted in the artificial inflation in the price of ProQuest's common stock and ultimately caused the damages and losses complained of herein.

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

72.     During the relevant period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

73.     The Company's reported financial statements between fiscal 1999 and the third quarter of fiscal 2005 were not prepared in accordance with GAAP. Defendants have now admitted that they caused and/or allowed the Company to improperly record royalty income and

38

expenses and failed to defer income, such that ProQuest is now forced to restate its financial results during this period to eliminate millions of dollars in previously reported income.

74.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that *financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.* SEC Rule 13a-13 requires issuers to file quarterly reports.

75.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

76.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

39

> *The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.* This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . . [Emphasis added.]

77.     The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. *To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.* [Emphasis added.]

78.     The Company's financial statements contained in the fiscal 2005 Form 10-K and/or the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(j)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(k)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

79.     In addition, during the Class Period, defendants violated SEC disclosure rules:

(a)     defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. ' 210.4-01(a)(1).

80.    Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.   The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP.

81.    Defendants knew, or were reckless in not knowing, the facts which indicated that the fiscal 1999 - 2005 Forms 10-K and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the relevant period, were materially false and misleading for the reasons set forth herein.

## CONCERTED ACTION ALLEGATIONS

82.    Defendants engaged in a scheme and common courses of conduct and acted in concert with, and aided and abetted one another to accomplish the illegal actions complained of herein.  Defendants either acted one with another to publish and disseminate the materially false and misleading information complained of herein, or allowed defendants to act in such manner to effectuate the publication of such materially false and misleading information.  The actions by defendants constituted a concerted course of action by defendants during the relevant period.

## DERIVATIVE ALLEGATIONS

83.    Plaintiffs bring this action, in good faith, derivatively in the right and for the benefit of ProQuest to redress damage suffered and to be suffered by ProQuest as a direct result of defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment, abuse of control and fraud.

84.    This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiffs will adequately and fairly represent the interests of ProQuest and

its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

85.     The adoption of the Sarbanes-Oxley Act during the relevant period also placed significant additional responsibilities on the Boards of Directors of ProQuest, to improve corporate financial, accounting and internal controls, and to improve corporate financial responsibility and disclosure. Thus, despite the ProQuest Board's public posture of concern over good corporate governance, controls, disclosure integrity and overall compliance with the Sarbanes-Oxley act, in fact, at all relevant times, defendants had caused or allowed defendants to falsify the Company's reported financial results. Any real compliance with Sarbanes-Oxley, however, would have exposed defendants' scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Board of ProQuest did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so, and they will not now sue themselves for their failures to achieve such compliance.

86.     Demand upon the Board of ProQuest that that they sue themselves for the damage that their misconduct has caused the Company would prove futile and useless, and it is obvious that defendants will not do so, and they have not done so. Another reason the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

87.     While ProQuest and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight

43

failings committed by its Board, the insiders and directors of this Company have not only escaped suffering similar injuries but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities.

88.     As a result of their concealments and falsifications, many of the directors and managers of ProQuest held onto their positions of power, prestige and profit at the Company. The managers of ProQuest obtained millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

89.     The ProQuest Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of ProQuest or its shareholders.

90.     The present Board of Directors of ProQuest has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and fraudulent and thus are acts incapable of ratification;

44

(d)    In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such action;

(e)    The members of the ProQuest Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of ProQuest. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)    The ProQuest directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion.  Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired.  The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

45

91.     In addition to the foregoing defendants will also not take the necessary remedial actions requested by plaintiff herein, because defendants face debilitating conflicts of interest, either as a result of their direct participation in the illegal and improper acts complained of herein, or their acquiescence in such acts, or otherwise, including in part the following:

(a)     Defendant Aldworth will not take the action requested by plaintiff herein because to do so would expose him personally to tens and possibly hundreds of millions of dollars in liability. At the time when defendants have admitted they filed false and misleading financial information, defendant Aldworth served as the senior most executive of the Company. Defendant Aldworth was directly responsible for the creation and filing of the Company's financial statements and operational reports as well as the day to day management of the Company. As a result of defendant Aldworth's direct participation in the illegal and improper acts complained of herein, any demand on defendant Aldworth to take the actions requested herein is excused;

(b)     Defendants Brown, Geltzeiler and Roubos will also not take the action requested by plaintiff herein because to do so would also expose each of them personally to tens and possibly hundreds of millions of dollars in liability. At the time when defendants have admitted they filed false and misleading financial information, defendants Brown, Geltzeiler and Roubos served as the only three members of the Audit Committee of the Board of Directors of the Company. As members of the Audit Committee these defendants were directly responsible for overseeing the creation and filing of the Company's financial statements and was responsible for assuring that such financial statements were true, accurate and filed in accordance with GAAP. As a result of these defendants direct participation in the illegal and improper acts

complained of herein, any demand on defendants Brown, Geltzeiler and Roubos to take the actions requested herein is excused;

(c)     Defendant Roemer will not take the action requested by plaintiff herein because to do so would also expose him to tens and possibly hundreds of millions of dollars in personal liability. At the time when defendants have admitted they filed false and misleading financial information, defendant Roemer served as Chairman of the Board of Directors. As Chairman of the Company's Board, defendant Roemer was responsible for overseeing and monitoring the creation and filing of the Company's financial statements and operational reports. As a result of defendant Roemer's failure to detect or prevent the Company's participation in the illegal and improper course of conduct complained of herein, any demand on defendant Roemer to take the actions requested herein is excused; and

(d)     Defendants Oberndorf, Brown, Roemer and Roubos will also take no action against Aldworth or the remainder of the Board of the Company because they have served as long-time members of the Company Board, and have developed personal and/or business relationships the extend beyond the Company, and which have created allegiances among themselves which prevent them from taking the action requested by plaintiff herein. As a result of these debilitating conflicts of interest, any demand on defendants Oberndorf, Brown, Roemer and Roubos to take the actions requested herein is also excused.

92.     Plaintiff has not made any demand on any shareholders of ProQuest to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     ProQuest is a publicly traded company with approximately 71.27 million shares outstanding that traded on the NYSE throughout the relevant period, which shares were held by thousands of shareholders located throughout the nation and abroad;

47

(b)     Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or telephone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## FIRST CLAIM FOR RELIEF

### Intentional Breach of Fiduciary Duty Against All Individual Defendants

93.     Plaintiff incorporates each and every allegation set forth above.

94.     Each of the Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to misstate ProQuest's financial statements in violation of applicable rules, regulations and industry standards, thus falsifying ProQuest's SEC filings and communications to shareholders and investors, including ProQuest's financial statements and information. These defendants knew that if they disclosed the true facts concerning ProQuest's business and financial condition, they would jeopardize their control over the companies, the remuneration they received and their positions of power, prestige and profit at ProQuest, while exposing themselves to suits and investigations and the risks of civil liability, criminal prosecution or regulatory action.

95.     As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ProQuest's

operations, financial condition, assets and earnings to their shareholders, as well as the financial markets. The Individual Defendants did not do this. Instead they concealed their wrongdoing and disseminated false and misleading statements and reports about ProQuest to its shareholders.

96.    The Individual Defendants, as officers and/or directors of ProQuest, participated in the acts of fraud and mismanagement alleged herein — knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to ProQuest shareholders. They have thus exposed ProQuest to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased ProQuest shares during the period between October 21, 2003 and July 25, 2005.

97.    The Individual Defendants also each owed a duty to ProQuest to test, oversee and monitor its systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia*, the Sarbanes-Oxley Act. Pursuant to Sarbanes-Oxley, because ProQuest was required to make accounting restatements due to noncompliance with GAAP and fraud in financial reporting as a result of the misconduct alleged herein, the Individual Defendants who served as CEO or CFO of ProQuest and each of its operating units, respectively, are required to reimburse ProQuest for the bonuses and other incentive-based and equity-based compensation received by them from ProQuest.

98.    Independent of Sarbanes-Oxley, all ProQuest's officers should be required to disgorge any and all gains unjustly obtained at the expense of ProQuest and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

49

99.     The conduct outlined herein was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

100.    By reason of the foregoing, ProQuest has been damaged.

## SECOND CLAIM FOR RELIEF

### Abuse of Control Against All Individual Defendants

101.    Plaintiff incorporates each and every allegation set forth above.

102.    For the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, ProQuest and to continue to receive the substantial benefits, salaries and emoluments associated with their positions, the Individual Defendants employed the alleged scheme. As a part of this scheme, these Individual Defendants actively made and/or participated in the making of or aided and abetted the making or the concealment of, numerous omissions and misrepresentations of facts regarding ProQuest to shareholders. These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.

103.    The Individual Defendants' conduct constituted an abuse of their ability to control and influence ProQuest. By reason of the foregoing, ProQuest has been damaged.

## THIRD CLAIM FOR RELIEF

### Gross Mismanagement Against All Individual Defendants

104.    Plaintiff incorporates each and every allegation set forth above.

105.    The Individual Defendants had a duty to ProQuest and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ProQuest.